UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-61665-CIV-DIMITROULEAS/Snow

DANI DEL ROSARIO-CASTILLO,

        Plaintiff,

     vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for Supplemental Security Income (SSI). The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

## I. PROCEDURAL HISTORY

The plaintiff filed an application for disability benefits on February 6, 2008, alleging disability since February 9, 2007, as a result of depression, anxiety, uterine tumors, high blood pressure and heart problems. The application was denied initially and upon reconsideration. The plaintiff then requested a hearing which was held before Administrative Law Judge Dean W.

Determan on March 18, 2009.  The Administrative Law Judge found that the plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the plaintiff's request for review on August 25, 2009.  The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. **FACTS**

The plaintiff was born on November 24, 1959, and was 49 years old at the time of her hearing.  She completed high school and one year of college.  The plaintiff's past relevant work was as a cashier, and she has not worked since February 6, 2008, when she applied for SSI benefits. (R: 97, 112, 128-29)

The medical record reflects that the plaintiff was treated with medication for depression while living in New York. She received treatment at the St. Mark's Place Institute for Mental Health for a brief period in 1993, and for an extended period from September 20, 1997, until October 19, 2000. Dr. Giovanni Nunez prescribed Prozac, Remeron and Ambien. (R:188)

Subsequent mental health care in New York was provided by David Molina, M.D., who completed a Physician's Employability Report in November 2002.  Dr. Molina stated that the plaintiff had "treatment resistant depression," causing the doctor to change the plaintiff's medication after loss of efficacy.  Dr. Molina's

diagnosis was Major Depression - Recurrent, and indicated that the plaintiff visited him once or twice per month.  The doctor believed that work expectations were not realistic and he encouraged the plaintiff to apply for Social Security benefits because of her mental illness. There is no indication in the record of how long the plaintiff was treated by Dr. Molina. (R: 340-41)

Beginning in January 2008, after she had moved to Florida, the plaintiff was treated at the Holy Cross Medical Group for depression, anxiety, back pain, abdominal pain, urinary incontinence and irritable bowel syndrome. (R:228-42, 326-37)  On February 25, 2008, Holy Cross physician Moises Irrizary, M.D., advised the Florida Department of Health that, in his opinion, the plaintiff suffered from a mental illness that significantly interfered with her daily functioning and medication had been prescribed for this condition, but no psychiatric referral had been made. (R:278)

On March 11, 2008, a consultative psychological examination of the plaintiff was performed by Dahlia V. Gordon, Psy.D.  The plaintiff told Dr. Gordon that she lived with her daughter and granddaughter, and that she was the legal guardian of her granddaughter because her daughter was irresponsible.  The plaintiff also related that she had worked for a cleaning company in Florida for six months, and as a cashier at a discount store for

one year.  The plaintiff left the cashier job approximately one year earlier for health reasons.  The plaintiff explained that she suffered from anxiety, panic attacks, sleep problems, back pain and leg pain.  (R:274-75)

Dr. Gordon noted that the plaintiff's medical records revealed that tests performed in 2007 had indicated mild chronic gastritis, reflux esophagitis, a spastic colon and hemorrhoids.  In 2008, the plaintiff underwent a hysterectomy as the result of uterine tumors, and also had bladder surgery.  The plaintiff told Dr. Gordon that she also suffered from hypertension, and reported experiencing blackouts associated with anxiety.  Her most recent blackout had been one year prior to the evaluation.  The plaintiff was taking medication for depression, anxiety, constipation, hypertension, acid reflux, chest and back pain and insomnia.  She stated that she had been using Xanax daily since 2001.  (R:275)

The plaintiff related that she was able to feed, dress and bathe herself.  She could travel alone, drive, make purchases, manage her finances and use a stove.  She had a valid driver's license.  The plaintiff complained of not sleeping well, even with medication.  She suffered from crying spells and constant anxiety, with panic attacks.  The plaintiff stated that her most recent attack had been the day before her appointment, and that the symptoms improved slightly with Xanax.  The plaintiff rated her

4

depression as a "4" on a scale of 1 to 10.  The plaintiff denied suicidal or homicidal ideation, but related that while sleeping, she sometimes thought she heard the voice of her son or her sister calling her name.  The plaintiff had not received psychiatric care since 2001.  Instead, she took medication prescribed by her primary care physician and talked with her sister. (R:275-76)

Dr. Gordon observed that the plaintiff's affect was appropriate and the plaintiff described her mood as "a little good."  The plaintiff's English was limited and the evaluation was performed in Spanish.  Her eye contact was good and she walked without the use of assistive devices.  There was no overt evidence of psychosis or thought disorder.  Although rapport was sufficiently established, Dr. Gordon felt that the plaintiff sometimes exaggerated her deficits on the mental status tasks, likely as a means of seeking assistance.  This observation was corroborated by the plaintiff's performance on the Rey Fifteen Item Memory Test. (R:276, 277)

Dr. Gordon found that the plaintiff's attention and concentration appeared to be impaired.  Mental tracking and graphomotor abilities appeared to be within normal limits.  No anomic or apraxic difficulties were noted.  The plaintiff's ability to calculate appeared to be limited to simple addition, subtraction and multiplication.  Her fund of knowledge and abstract reasoning

5

ability were fair, but limited.  Additionally, the plaintiff's sense of social judgment was likely to be limited at times by anxiety.  Her intellectual ability was at least within the low average range, and her insight was fair.  The plaintiff appeared to be able to independently manage her finances. (R:276-77)

Dr. Gordon concluded that the plaintiff appeared to be experiencing chronic and long-term symptoms of depression, with intermittent episodes of major depression.  She also had chronic anxiety with panic attacks which are controlled with the use of anxiolytic medication, to which the plaintiff had become dependent (based on her daily use of Xanax since 2001). The plaintiff's ability to maintain stable employment was likely to be limited by her depressive syndrome.  She was capable of performing simple and repetitive tasks, but her motivation may be limited by her emotional status.  Dr. Gordon diagnosed Dysthymic Disorder (with history of Major Depressive Episodes), Generalized Anxiety Disorder (with panic attacks which are controlled with the use of Xanax), likely anxiolytic dependence.  She recommended referral for individual psychotherapy. (R:277)

On March 26, 2008, the plaintiff underwent a consultative physical examination by John Catano, M.D.  The plaintiff told Dr. Catano that she had experienced lower back pain for several years. She described the pain as stabbing and occasionally radiating to

6

her lower extremities.  The pain was aggravated by bending, mopping or cleaning.  The plaintiff rated her pain as 8 on a scale of 1 to 10, and stated that it improved with the use of anti-inflammatories and analgesics.  She also used hot packs.  The plaintiff reported that she suffered from scoliosis, but had not had physical therapy or surgical evaluation.  The plaintiff estimated that she could walk up to three blocks, stand up to one hour, lift up to 20 pounds and sit without restriction. (R:279)

On physical examination, the plaintiff's joints were normal, with normal range of motion.  Her gross and fine manipulation were intact, with good grip and no atrophy.  The plaintiff had no tenderness and full range of motion in her neck.  However, the plaintiff exhibited moderate tenderness and spasms in the paraspinal muscle.  Straight leg raising in the supine and seated positions was negative.  Range of motion in the low back was 60 degrees of anterior flexion.  The plaintiff could not tandem walk, but could walk on her heels and toes.  Her gait was normal and she did not use an assistive device.  The plaintiff could get in and out of a chair, and on and off the examination table with no difficulty.  Neurological examination was normal.  Mental status examination revealed that the plaintiff was oriented to three planes, but looked depressed.  Her communication skills were normal.  Dr. Catano diagnosed history of depression, history of

GERD, and chronic lower back pain, musculoskeletal type. (R:280-81)

Holy Cross treatment notes reflect that on July 9, 2008, the plaintiff had run out of her medication 45 days earlier. On September 10, 2008, the plaintiff was referred to a psychiatrist for evaluation and treatment of depression. (R:334-36) On September 23, 2008, the plaintiff was examined by Luis Gold, M.D., a psychiatrist.[1] The plaintiff reported a history of depression anxiety and panic attacks, and stated that she was taking Xanax and Celexa. The only symptom observed by Dr. Gold was a constricted affect. He diagnosed Major Depressive Disorder, continued the plaintiff on Xanax and increased her dosage of Celexa. (R:323-324)

On January 20, 2009, the plaintiff was evaluated by Serge Litvinov, M.D. On mental status examination, the only symptom the plaintiff exhibited was a depressed mood. She reported low energy and crying a lot, poor concentration and panic attacks. Dr. Litvinov diagnosed major depressive disorder, without psychotic features, and assigned a Global Assessment of Functioning (GAF) score of 45. On February 11, 2009, Dr. Litvinov noted that the plaintiff's mood was appropriate rather than depressed, but the plaintiff reported that she was feeling much worse. She stated

---

[1] The two pages of notes are not signed or otherwise identified, but the plaintiff has identified them as authored by Dr. Gold.

8

that she had low energy level, felt helpless, hopeless and anxious and could not sleep.  Dr. Litvinov's diagnosis was Major Depressive Disorder with psychotic features.   He increased the plaintiff's dosage of Celexa and added Abilify to her medications. (R:346-48)

On March 3, 2009, Dr. Litvinov completed a Mental Functional Capacity Questionnaire, which included a Psychiatric Impairment Evaluation.   Dr. Litvinov diagnosed Major Depressive Disorder, Severe, with a fair to good prognosis.   Dr. Litvinov noted that the plaintiff felt helpless and hopeless, with low energy, poor appetite and poor sleep, and that she sometimes heard voices.  Her impairments had lasted or could be expected to last 12 months, and emotional factors contributed to the severity of the plaintiff's symptoms and functional limitations.  In Dr. Litvinov's opinion, the plaintiff was not a malingerer. (R: 342)

Regarding the plaintiff's mental status, Dr. Litvinov found that she had a slight deficit or reduction in intelligence, thinking and judgment; moderate deficit or reduction in perception and affect, and moderately severe deficit or reduction in behavior. As to mental capacity, Dr. Litvinov determined that the plaintiff had a good ability to independently perform routine repetitive tasks; a fair ability to understand, carry out and remember simple instructions and to perform simple tasks; and a "marked" deficit in the  ability to sustain concentration to task, sustain attention to

task, achieve goals and respond to time limits, perform work requiring regular contact with others, relate appropriately to supervisors and co-workers, relate appropriately to the public, maintain socially appropriate behavior and adherence to basic standards of neatness and cleanliness, respond appropriately to usual work situations, respond appropriately to changes in work setting, respond appropriately to the stress of customary work pressures in work environment, maintain production standards, make simple work-related decisions and perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. (R:343-45)

On March 27, 2009, a Mental Residual Functional Capacity Assessment of the plaintiff was completed by Angela Register, Ph.D., a state agency non-examining psychologist. In the category of Understanding and Memory, Dr. Register found that the plaintiff was not significantly limited in her ability to remember locations and work-like procedures and the ability to understand and remember very short and simple instructions, but was moderately limited in her ability to understand and remember detailed instructions. (R: 285)

In the category of Sustained Concentration and Persistence, the plaintiff was not significantly limited in her ability to carry out very short and simple instructions; maintain

10

attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them, and make simple work-related decisions.  The plaintiff was moderately limited in her ability to carry out detailed instructions and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  In the categories of Social Interaction and Adaptation, the plaintiff had no significant limitations. (R:285-86)

Dr. Register opined that the plaintiff was mildly to moderately depressed and anxious, with some difficulty in cognitive functioning.  She likely would have difficulty sustaining performance of detailed tasks, but could perform simple tasks.  Dr. Register noted that the plaintiff managed money, shopped for groceries, ironed, cooked, handled her personal care and did house cleaning within physical tolerances.  Dr. Register concluded that the plaintiff  could understand, recall and carry out simple repetitive tasks over a normal workday/workweek. (R:287)

On April 19, 2008, a Physical Residual Functional Capacity Assessment of the plaintiff was completed by Gary Cater,

D.O., a state agency non-examining physician.  Dr. Cater opined that the plaintiff could lift 50 pounds occasionally and 25 pounds frequently.  She could stand/walk or sit for about 6 hours in an 8-hour workday, and had an unlimited ability to push and/or pull. The plaintiff had no postural, manipulative, visual, communicative or environmental limitations.  In Dr. Cater's view, the plaintiff's allegation that she was unable to work was not supported by the medical evidence of record. (R: 290-94)

A second Physical Residual Functional Capacity Assessment was completed by another state agency physician, Belanje Hedge, M.D., on July 16, 2009.  Dr. Hedge's assessment was the same as Dr. Cater's, except that Dr. Hedge found that the plaintiff could lift only 20 pounds occasionally and 10 pounds frequently.  Dr. Hedge summarized the findings of the consultative examining physician, Dr. Catano, and concluded that the plaintiff's allegations regarding her symptoms were partially credible and were taken into account.  (R:298-302)

A second Mental Residual Functional Capacity Assessment was completed by Robin McCallister, Ph.D., a state agency non-examining psychologist, on July 29, 2009.  Dr. McCallister's conclusions were the same as those of Dr. Register, except that Dr. McCallister found no evidence of limitation in the plaintiff's ability to understand and remember detailed instructions. (R: 305-

06) Dr. McCallister also completed a Psychiatric Review Technique Form, indicating that the plaintiff suffered from Dysthymic Disorder, with a history of major depressive disorder episodes, and generalized anxiety disorder, with panic attacks controlled by medication.  Dr. McAllister determined that the plaintiff had mild limitations in the activities of daily living, and in maintaining social functioning.  She had moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation. (R: 312, 314, 319)  Dr. McCallister cited the findings of the consultative psychologist, Dr. Gordon and the plaintiff's activities of daily living, concluding that the plaintiff was capable of simple, routine tasks. (R:307, 321)

At the disability hearing, the plaintiff testified that she sees her psychiatrist every month, but does not attend group therapy sessions between visits.  She stated that sometimes when she is sleeping she wakes up when she thinks she hears a male voice, which frightens her.  The plaintiff described her panic attacks, which also frighten her.  The attacks occur nearly every day, and she takes Xanax for them.  The plaintiff also has been taking a new medication, Abilify, which has helped her a little. She takes Lisinopril for high blood pressure, and Xanax to help her sleep.  The plaintiff sleeps for about five hours per night. (R:30-34, 36-7)

The plaintiff's daily activities include getting her granddaughter ready for school and taking her to the bus, taking her pill and relaxing at home.  The plaintiff does not drive very often.  She cannot work because her mind is not in control and she makes many mistakes counting.  Also, she has no one to take her son to work.  The plaintiff stated that she has suffered from depression for a very long time, and five years ago tried to kill herself. (R:35-36, 39-41)

### III. <u>DECISION OF THE ALJ</u>

The ALJ first noted that although SSI is not payable prior to the month following the date of the plaintiff's application for benefits, he had considered the plaintiff's complete medical history in his disability determination.  The ALJ found that the plaintiff had not engaged in any substantial gainful activity since her application date of February 6, 2008.  He also found that the plaintiff suffered from the following severe impairments: hypertension, status post hysterectomy, history of uterine fibroids, disorders of the back, gastroesophageal reflux disease, anxiety and depression.  (R: 11, 13)

Following a summary of the medical evidence, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R: 13-

15)  The ALJ stated that in making his finding that the plaintiff's mental impairments did not meet or equal a listed impairment, he considered the "paragraph B" criteria of listings 12.04 (Affective Disorders) and 12.6 (Anxiety-Related Disorders).  He noted that to satisfy the criteria of paragraph B of each of these listings, the plaintiff's mental impairment must result in at least two of the following: marked restriction of the activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration. The ALJ also noted that a "marked" limitation is one which is more than moderate, but less than extreme. (R:15)

        Specifically, the ALJ first found that the plaintiff had mild restriction in the activities of daily living, based on her own statements at the hearing and elsewhere in the record.  Next, the ALJ found that the plaintiff had mild difficulties in social functioning.  He based this finding on: Dr. Irrizary's notation that the plaintiff's mood and affect were within normal limits; Dr. Gordon's observation that the plaintiff was in a good mood, had good eye contact, had no speech abnormalities, and displayed no overt psychosis or thought disorder; Dr. Catano's finding that the plaintiff's communication skills were normal; Dr. Gold's determination that the plaintiff's affect was appropriate; Dr.

Litvinov's report that the plaintiff's mood and affect were appropriate, though depressed, that her speech was normal and her demeanor was cooperative and calm, as well as the plaintiff's statements that she walked with her grandchildren, got along with family, friends, neighbors and authority figures, but could not handle well stress or changes in routine.  (R: 15-16)

In the third category dealing with concentration, persistence or pace, the ALJ found that the plaintiff had moderate difficulties.  This finding was premised on Dr. Irrizary's report that the plaintiff had good insight and judgment, good recent and remote memory and was oriented in all spheres; Dr. Gordon's determinations that the plaintiff could make purchases and manage her finances, was oriented in all spheres, had impaired attention and concentration, limited calculation skills, fair but limited fund of knowledge, abstract reasoning, insight and judgment, was of low average intelligence and seemed to be exaggerating some of her deficits; Dr. Catano's and Dr. Gold's findings that the plaintiff was oriented in all spheres; Dr. Litvinov's observation that the plaintiff's memory was intact, and the plaintiff's statement that she could handle finances, but had problems with following verbal instructions.  As to the last category, the ALJ found that the plaintiff had no episodes of decompensation. (R: 16-17)

16

In connection with his determination that the plaintiff's mental impairments did not meet or equal any listed impairment, the ALJ pointed out:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listing in 12.00 of the Listing of Impairments. (SSR 96-8p)

(R:17)

The ALJ next determined that the plaintiff retained the residual functional capacity to perform the full range of light work. He noted that the function report completed by the plaintiff indicated that she had problems with lifting, squatting, bending, kneeling, climbing stairs and memory. Additionally, the plaintiff testified that she experienced panic attacks, auditory hallucinations which frightened her at night, and long-term depression. The ALJ also noted that the plaintiff had testified that she could not work because her mind is not in control, and also because she makes mistakes counting and cannot drive every day. The ALJ found that the plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were

17

not credible to the extent that they were inconsistent with the ALJ's residual functional capacity assessment. (R:18)

The ALJ based this credibility determination on the psychological findings already noted from Doctors Irrizary, Gordon, Catano, Gold and Litvinov; the fact that the plaintiff's uterine and bladder problems had been surgically corrected; Dr. Catano's observations that the plaintiff's only physical problems consisted of moderate tenderness and spasm in her paraspinal muscle, decreased range of motion in the lumbar spine and an inability to tandem walk; the plaintiff's failure to attend group therapy and noncompliance with her medications for 45 days in 2008; the plaintiff's lack of any treatment between April 2006 and August 2007, and Dr. Gordon's comment that the plaintiff appeared to have been exaggerating her symptomatology for secondary gain. (R:18-21)

Regarding opinion evidence, the ALJ gave little weight to Dr. Molina's opinion that the plaintiff's major depression was resistant and that work expectations were unrealistic because the doctor did not provide medical evidence to back up his opinion on the plaintiff's employability and because the issue of disability is reserved to the Commissioner.  The ALJ also gave little weight to Dr. Irrizary's opinion that the plaintiff's daily functioning was significantly affected by her mental condition, because the doctor is not a psychologist or psychiatrist and had not referred

18

the plaintiff for psychiatric treatment.  Dr. Litvinov's opinion
was likewise given little weight because he did not begin to treat
the plaintiff until January 2009, and his opinion assessments did
not correspond with his two treatment notes. (R:21)

The ALJ gave great weight to the opinion of the
consultative psychologist, Dr. Gordon, and the two state agency
psychologists, Dr. Register and Dr. McCallister, because their
assessments were supported by the objective medical evidence and
other substantial evidence of record.  Each of these psychologists
found that the plaintiff was capable of performing simple
repetitive tasks.  (R:22-23)

With respect to the plaintiff's physical capabilities,
the ALJ gave great weight to the assessment of state agency
physician Belanje Hedge, M.D., who found that the plaintiff could
lift and carry 20 pounds occasionally and 10 pounds frequently;
could stand, sit or walk for 6 hours during an 8-hour workday; had
an unlimited ability to push and pull, and had no postural,
manipulative, visual, communicative or environmental limitations.
Dr. Hedge believed that the plaintiff's symptoms were attributable
to a medically determinable impairment, but that her allegations
regarding the severity of the symptoms were only partially
credible.  The ALJ gave considerable weight to the opinion of state
agency physician Gary Cater, D.O., whose findings were the same as

Dr. Hedge, except that Dr. Cater determined that the plaintiff could lift 50 pounds occasionally and 25 pounds frequently.  On that point, the ALJ found that Dr. Cater had overestimated the plaintiff's residual functional capacity.  (R:23)

The ALJ concluded that the plaintiff was capable of performing her past relevant work as a cashier, which is categorized by the Dictionary of Occupational Titles (DOT) as light and unskilled.  He determined that mental restrictions such as a moderate inability to carry out detailed instructions or complete a normal work day or work week would not significantly affect the potential unskilled light occupational base, citing SSR 83-14. Since the plaintiff retained the residual functional capacity to perform her past relevant work, she was not disabled for purposes of the Social Security Act.

### IV. <u>MOTIONS FOR JUDGMENT ON THE PLEADINGS</u>

### <u>AND FOR SUMMARY JUDGMENT</u>

The plaintiff has moved for judgment on the pleadings, first on the ground that the ALJ failed to spell out the plaintiff's mental limitations in his residual functional capacity assessment, referring to them only in his conclusion that the plaintiff's mental limitations would not prevent her from performing her past relevant work as a cashier.  The plaintiff also

argues that the ALJ erred by discounting the opinion of the plaintiff's most recent psychiatrist, Dr. Litvinov.

Second, the plaintiff contends that the ALJ was required to make a separate finding and analysis of the physical and mental requirements of the plaintiff's past relevant work before determining whether she could return to that work, citing <u>Davison v. Halter</u>, 171 F. Supp. 2d 1282 (S.D. Ala. 2001). Additionally, the plaintiff asserts that the mental restrictions cited by the ALJ in his conclusion are incompatible with the DOT description of the duties of cashier.

The Commissioner seeks summary judgment, arguing that the decision of the ALJ should be affirmed because it was based on substantial evidence in the record and the correct legal standards were applied.

## V. <u>RECOMMENDATIONS OF LAW</u>

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389 (1971);

Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983).  The Court must review the record as a whole to determine if the decision is supported by substantial evidence.  Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards.  No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  Richardson, supra.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the

burden returns to the claimant to prove his or her inability to perform such work.

In the instant case, the plaintiff asserts that the ALJ erred at Step 4 of the Sequential Evaluation process, in both his assessment of the plaintiff's residual functional capacity and his determination that she can perform her past relevant work as a cashier. The plaintiff contends that the ALJ failed to incorporate his findings on the plaintiff's mental impairments into his residual functional capacity assessment, and failed to discuss the specific requirements of the plaintiff's past work as a cashier prior to concluding that she could perform that work.

A. Residual Functional Capacity

Although the ALJ found that the plaintiff suffered from the severe impairments of anxiety and depression, and discussed those impairments at length in his decision, he inexplicably found that the plaintiff could perform the *full range* of light work. The ALJ gave great weight to the opinions of the consultative psychologist, Dr. Gordon and the agency non-examining psychologists, but he made no mention in his residual functional capacity assessment of the limitations they described. Each of these psychologists found that the plaintiff was limited to performing simple, repetitive tasks, indicating that the

plaintiff's nonexertional impairments prevented her from performing the full range of light work.

In making a disability determination, the ALJ is required to consider each of the claimant's impairments, as well as the combined effect of all impairments. 42 U.S.C. § 423(d)(2)(B); Gibson v. Heckler, 779 F. 2d 619, 623 (11th Cir. 1986). The ALJ should make specific and well-articulated findings as to the effect of the combination of impairments and whether the combined impairments cause the claimant to be disabled. Bowen v. Heckler, 748 F.2d 619, 635 (11th Cir. 1984); Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987).

In the instant case, the Commissioner suggests that the plaintiff's limitations, though not identified in the ALJ's residual functional capacity determination, are recognized by the ALJ throughout his decision and in his conclusion. The Commissioner cites no authority permitting this Court to infer limitations in an ALJ'S residual functional capacity assessment which are not specifically identified by the ALJ. As it stands, the ALJ's finding that the plaintiff retains the residual functional capacity to perform the full range of light work is not supported by substantial evidence in the record, and remand is required to permit the ALJ to explicitly identify the plaintiff's residual functional capacity after incorporating the effects of all

24

her impairments.  Morrison v. Barnhart, 278 F. Supp. 2d 1331, 1336-37 (M.D. Fla. 2003).

The plaintiff also argues that the ALJ erred by failing to accord sufficient weight to the opinion of the plaintiff's treating psychiatrist, Dr. Litvinov.  The testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 CFR §§ 404.157(d)(2), 416.927(d)(2)(1999). This Circuit has held that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the physician's opinion was conclusory or inconsistent with their own medical records.  Lewis, 125 F.3d at 440; Jones v. Department of Health & Human Services, 941 F.2d 1529, 1532-3 (11th Cir. 1991); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).

Here, the ALJ accorded little weight to Dr. Litvinov's opinion because the doctor did not begin treating the plaintiff until January 2009, and because his opinion was not consistent with his two treatment notes.  It appears from the record that Dr. Litvinov had only seen the plaintiff on two occasions prior to

rendering his opinion, and his notes on each visit consist of less that one page of handwriting.  By contrast, the consultative examiner, Dr. Gordon, administered several tests and composed a detailed report.  Moreover, little or none of the comments in Dr. Litvinov's notes support the conclusions set forth in his Mental Functional Capacity Questionnaire.

Under these circumstances, the undersigned finds there was good cause for the ALJ's refusal to accord controlling or considerable weight to Dr. Litvinov's opinion.  *See,* 20 C.F.R. § 416.927(d)(2).  Accordingly, remand for reconsideration of the weight to be given to this opinion is not required.

B. Past Relevant Work

The plaintiff argues that the ALJ erred in his conclusion that she could perform her past relevant work as cashier.  The plaintiff points out that the ALJ made no factual findings on the demands of the plaintiff's former job, and also contends that the DOT's description of the position of cashier is inconsistent with the plaintiff's mental limitations.

Social Security Ruling (SSR) 82-62 provides that an ALJ must make three findings of fact before concluding that a claimant can return to his or her past relevant work: the ALJ must make findings as to the individual's residual functional capacity, the physical and mental demands of his or her past relevant work, and

whether the claimant's residual functional capacity would permit a return to his or her past relevant work.

SSR 82-61 states that there are three possible tests for determining whether a claimant retains the capacity to perform his or her past relevant work, namely:

> 1. Whether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, e.g. "delivery job," "packaging job," etc. . . .
>
> 2. Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it. . . .
>
> 3. Whether the claimant retains the capacity to perform the functional demands of the job as ordinarily required by employers throughout the national economy. (The *Dictionary of Occupational Titles* (DOT) descriptions can be relied upon -- for jobs that are listed in the DOT -- to define a job as it is *usually* performed in the national economy.) . . .

The Ruling points out that a finding based on the first of these tests "is likely to be fallacious and unsupportable."

SSR 82-62 elaborates:

> Determination of the claimant's ability to do PRW requires a careful appraisal of (1)the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information

27

> from other sources such as employers, the
> *Dictionary of Occupational Titles*, etc., on
> the requirements of the work as generally
> performed in the economy.

The Ruling emphasizes that the determination of whether a claimant can perform past work "has far-reaching implications and must be developed and explained fully in the disability decision," and "every effort must be made to secure evidence that resolves the issue as clearly and explicitly as possible."

Here, the ALJ's treatment of this issue consisted of a few sentences, immediately following his erroneous determination of the plaintiff's residual functional capacity:

> The claimant's past work as a cashier was
> light in exertion and unskilled (SVP
> 2)(Dictionary of Occupational Titles 211.462-
> 010). In comparing the claimant's residual
> functional capacity with the physical and
> mental demands of this work, the undersigned
> finds that the claimant is able to perform it
> as generally performed. Mental restrictions
> such as a moderate inability to carry out
> detailed instructions or complete a normal
> work day or work week would not significantly
> affect the potential unskilled light
> occupational base.

(R: 23-24, citing SSR 83-14 (using the Grids as a framework for evaluating a combination of exertional and non-exertional impairments at Step 5 of the Sequential Evaluation process)).

The ALJ elicited no testimony from the plaintiff on the physical and mental demands of her job as cashier, and did not discuss any of the plaintiff's statements on this subject contained

28

elsewhere in the record.  Similarly, the ALJ did not draw upon evidence from the medical record regarding how the plaintiff's impairments did or did not limit her ability to perform the duties of cashier.  He did not even quote the DOT description of the job of cashier, to which he referred, or explain the basis on which he concluded that the plaintiff's mental restrictions (including moderate inability to carry out detailed instructions or complete a normal work day or work week) would not significantly affect her ability to perform her past work.

The undersigned finds that the ALJ's abbreviated discussion of the plaintiff's ability to perform her past relevant work falls far short of the full explanation and development and the clear and explicit resolution mandated by SSR 82-62.  On remand, after re-assessing the plaintiff's residual functional capacity by incorporating her mental limitations, the ALJ must fully articulate the basis for determining whether the plaintiff can perform the physical and mental requirements of her past relevant work, as prescribed in SSRs 82-61 and 82-62.  *See*, <u>Davison v. Halter</u>, 171 F. Supp. 2d 1282, 1284-85 (S.D. Ala. 2001).

The plaintiff also contends that the plaintiff's limitations render her incapable of meeting the demands of the job of cashier, as described in DOT 211.462-010.  It is not necessary to decide this issue, since on remand, the ALJ must re-assess the

plaintiff's residual functional capacity and make the explicit findings regarding ability to perform the demands of her past relevant work.  This analysis may result in different findings and conclusions, which should be left to the ALJ.

## VI. <u>CONCLUSION</u>

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the plaintiff's Motion for Judgment by the Pleadings (DE 14) be GRANTED, in part.  This case should be remanded to the ALJ for a re-assessment of the plaintiff's residual functional capacity and her ability to perform her past relevant work, consistent with SSR 82-61 and SSR 82-62. It is further

RECOMMENDED that the Commissioner's Motion for Summary Judgment (DE 19) be DENIED.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. <u>LoConte v. Dugger</u>, 847 F.2d 745 (11th Cir. 1988), <u>cert. denied</u>, 488 U.S. 958

(1988); <u>RTC v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 6th day of August, 2007.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

Luis Alberto Segarra, Esq. (P)
AUSA David I. Mellinger (D)